**GREEK CATHOLIC UNION v. AMERICAN SURETY CO. OF NEW YORK et al.**

Circuit Court of Appeals, Third Circuit. March 17, 1928.

No. 3662.

**1. Insurance ⟨⟩2—Contract and adjustment of paid surety are to be adjudged on basis of insurer.**

A surety, paid for its suretyship, is adjudged in law an insurer, and contract and adjustment are to be adjudged on that basis.

**2. Insurance ⟨⟩508½—Beneficiary, making agreement to reduce loss after notifying surety and failure to act, held entitled to submit claim for resulting loss to jury.**

Where beneficiary, under contract of suretyship guaranteeing loss resulting from misapplication of funds by officer or employee of beneficiary, or failure to perform duties, notified surety at time of contemplated loss, due to officer's breach of duty, and on failure of surety to act entered into agreement in attempt to reduce loss, it was entitled to have its claim for loss suffered on readjusted basis submitted to jury.

**3. Principal and surety ⟨⟩99—Generally surety can be relieved from obligation of suretyship only when insured's departure from contract is material.**

Generally, in case of variation from a surety insurance contract by insured, surety can be relieved from obligation of suretyship only when departure from contract is shown to be material variance.

Woolley, Circuit Judge, dissenting.

In Error to the District Court of the United States for the Western District of Pennsylvania; Frederic P. Schoonmaker, Judge.

Suit by the Greek Catholic Union against George Kondor and the American Surety Company of New York, removed from state

court by defendant last named. Judgment in favor of defendant last named, and plaintiff brings error. Reversed and remanded.

Ralph C. Davis and Thomas S. & O. W. Brown, all of Pittsburgh, Pa., for plaintiff in error.

Edmund W. Arthur and James M. Magee, both of Pittsburgh, Pa., for defendant in error.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

BUFFINGTON, Circuit Judge. On July 19, 1920, the American Surety Company, a corporate citizen of New York, in consideration of $500 premium, gave its surety bond to the Greek Catholic Union, a fraternal beneficial society and a corporate citizen of Pennsylvania, whereby it became surety for the officers and employees of such society, amongst whom was George Kondor, its treasurer. The bond was conditioned "to pay such order such pecuniary loss as it shall have sustained of money, funds, securities, or·other personal property, including that for which the order is responsible (a) through * * * willful misapplication on the part of any such officer or employee, * * * or through the failure of any such officer or employee faithfully to perform his (or her) duties as prescribed by the constitution and by-laws of said order." It was provided by the constitution and by-laws of the society that "the treasurer is not allowed to carry more than $25,000 on a checking account over and above amount necessary for the payment of the death benefits monthly. All surplus funds above these amounts shall be deposited in interest-bearing deposits with safe banks, or invested in safe and legal bonds, according to the discretion of the Supreme Assembly from time to time. All such deposits and investments to be made in the name of the Greek Catholic Union. * * * The treasurer shall deposit all orphans' money in interest-bearing reliable banks, bearing 4 per cent. interest, such deposits not to exceed $10,000 in one bank."

Alleging a violation by Kondor in that respect and of other provisions and a consequent loss thereby to it, the society brought suit in a state court against Kondor, alleging his breach of duty as treasurer and the liability of the American Surety Company as surety. As Kondor made no. defense and admitted his breach and liability, the controversy therefore became one between the plaintiff and the surety company, and the latter removed the case to the court below. It there filed an affidavit of defense, which under the provisions of the applicable Pennsylvania Procedure Act, really constituted a demurrer, on hearing of which the court entered judgment in favor of the defendant. Thereupon the society sued out this writ of error. [1, 2] Accepting as true the allegations of the plaintiff's statement, we note the fact that under the rules of the society the sum which the treasurer could lawfully carry in his checking account at the time of the alleged breach was not more than $45,000, but that in violation of this provision he had accumulated during the months of January, February, and March, 1924, in an insolvent state bank of which he was president, and which had a capital of but $50,000, some $217,000. It is therefore apparent that by so doing he had failed to do his duty and his bond was breached.. On April 4, 1924, the Pennsylvania state banking commissioner took charge of its affairs, and examination by that official showed the bank was insolvent, and, if liquidated, would .not pay more than 40 per cent. to its depositors. In pursuance of the requirement of the bond that notice of such loss be delivered to the surety at its home office in the city of New York within 10 days after such discovery, the surety company was at once informed by long-distance phone of the situation. It did nothing, offered no suggestion, and the society was apparently left to meet the situation alone and as best it could.

We here note that, when the breach, which previously occurred, became known, the liability of the surety had accrued, and a loss of some $140,000 in the deposit was apparent. What were the respective rights, duties, and obligations at this point? Notice to the surety. That was given. What was the relation of the surety? Being a surety paid for its suretyship, the law adjudges it an insurer, and adjudges its contract and its adjustment on that basis. City of Philadelphia v. Fidelity & Deposit Co. of Maryland, 231 Pa. 208, 80 A. 62, and cases cited. With liability on the bond accrued, with loss certain to follow, with the insur·r. company, with notice, taking no step and leaving .the insured society to meet the situation alone, we think that situation was one akin to salvage, and not one of variation from the contract of suretyship. In fire and marine insurance the insured in the face of threatened loss may act for the benefit of all concerned. He may remove the fire-threatened goods from a building, or he may jettison a cargo. If he does so, and thereby the goods or cargo are lost, stolen, or destroyed, he does not lose his right to recover from the insured, even though, if left in place on land or aboard at sea, they would not have been

lost. See 4 Cooley's briefs on Insurance, 3065; Independent Mut. Insurance Co. v. Agnew, 34 Pa. 96, 75 Am. Dec. 638. And the reason of this is that the situation was one that brooked no delay and the acts of the insured, though done in the absence of the other party, were done for the joint benefit of both.

Now here the situation was one that brooked no delay. Whatever was done had to be done on the intervening Sunday; further consultation with the surety was impossible, for Sunday prevented it, and with Monday morning, the bank, already in charge of the state authorities, would be irretrievably closed, with a 40 per cent. liquidation. If the insured society had followed the example of the surety company, done nothing, and had not effected the then possible adjustment, when by such adjustment it could have reduced the loss of the surety company, the latter might well have complained that its rights had been sacrificed by the society. Confronted on a Saturday by this critical condition, which required prompt action before the following Monday morning, the society officers and their counsel met that evening at Johnstown, and by long-distance phone at once told the agent of the surety company at Pittsburgh and an executive officer at New York of the situation. As noted above, they did nothing, offered no suggestion, and left the insured to meet the situation as best it could. This it did by Monday morning, with the result that Kondor's bank was taken over by the United States Trust Company of Johnstown, and all its depositors, with the exception of the plaintiff company, were guaranteed and were eventually paid in full. Had this not been done, had the plaintiff done nothing, and liquidation by the state banking authorities on a 40 per cent. basis proceeded, and but $86,000 realized on Kondor's $217,000 checking account, the surety company stood liable to be called on to make up the $131,000 loss to the extent of its $100,000 bond, with the society losing *̇ balance. This was the alleged benefit rendered the insured.

To save this situation the society made the arrangement noted, but to induce the trust company to take over the insolvent bank the society had to agree that Kondor's checking account should remain on deposit with the trust company without interest for four years, or in other words the plaintiff had to suffer a loss of $41,600 interest. This was the alleged sacrifice of the insured. To recover this sum, inter alia, this suit was brought.

[3] Now the authorities are clear that, even

when a variation from such a surety insurance contract is made by the insured, "the courts," as stated in Philadelphia v. Fidelity & Deposit Co., 231 Pa. 208, 80 A. 62, Ann. Cas. 1912B, 1085, "generally hold that such company can be relieved from its obligation for suretyship only where a departure from the contract is shown to be a material variance." To the same effect is Philadelphia v. Ray, 266 Pa. 345, 109 A. 689, which says the surety company "must prove also that the change is material and prejudicial." Such being the burden on the surety company, where there is a change from the original contract, the same principle applies with even stronger force, where, as here, there was no variation from the original contract, but the case was one of attempted salvage and diminution of loss by the insured after the unchanged contract had been breached, and when the insurer, with notice of the loss, left the insured to meet the situation alone.

We have discussed the case as it appears from the plaintiff's allegations. What the facts may prove on the trial we have not before us. We simply hold that, standing alone on the allegations made, the plaintiff had a right to have its claim for $41,600 for lost interest submitted to the jury. As to the other items claimed, we find no justification therefor.

The judgment below is reversed, and the case remanded for proceedings in due course.

WOOLLEY, Circuit Judge (dissenting). Fearing that the judgment of the court will in a measure unsettle the law of suretyship, I am constrained to dissent. My reasons, shortly stated, are these:

The case came before the District Court as though on general demurrer to a narr. Therefore all facts well pleaded are admitted. The first fact is that Kondor was an official of the plaintiff beneficial order, charged with the duty properly to handle its funds; the next, that the defendant surety company assured the faithful performance of his official duties. Then follow two more: One, that Kondor violated his trust; the other, that the surety company thereupon became liable to the plaintiff for a large money loss. All these facts are definitely averred, for without them the plaintiff could not make a case, and without their admission by the demurrer there would be nothing on which the court could base a judgment. For present purposes, these facts are established. The liability of the surety company became fixed when Kondor violated his official duties and loss occurred; and at the same time the surety company's rights became fixed.

Then what happened? The plaintiff was confronted by the certainty of a substantial loss; that is, a loss substantially in excess of the amount for which it was protected by the surety bond. Kondor had withheld the plaintiff's money and deposited it in his own bank, which was about to be closed by state authorities. It was Saturday night and the state authorities were going to act on Monday morning. That something should be done and done quickly was evident. Conferences of the plaintiff's officers, local bankers and state officials were hastily called, the bank's assets and liabilities canvassed, informal and incomplete estimates of the probable loss to depositors made and, eventually, a plan was proposed whereby another bank should take over and hold as its own the deposits of Kondor's bank and pay all except the plaintiff's very large deposit, which should be retained by the rescuing bank for four years without interest. Manifestly, the plaintiff was in a grave situation. It had, however, two ways out—one, acceptance of the proposed plan; the other, resort to the defendant's bond—two opposite courses. Neither promised complete escape. It did not then occur to any one that the plaintiff could get out of the dilemma by traveling both paths at once. Legally and practically, that was impossible. Some one late that night phoned an agent of the defendant surety company and informed him of the problem. Neither the agent nor any one else connected with that company said or did anything before Monday morning, by which time the transaction was closed. Of this the plaintiff complains and the court makes a point. Yet neither the agent nor the surety company was bound to say or do anything, for that company's rights and its duties and its liability had been fixed by previous events. Notice of the situation transmitted by phone, even if it had reached a responsible official, imposed no duty on the surety company to speak or act. A. B. Leach & Co. v. Peirson, 275 U. S. 120, 48 S. Ct. 57, 72 L. Ed. ——, decided November 21, 1927. Responsibility for action was with the plaintiff alone. Responding to the sound advice of its counsel, the plaintiff on Sunday decided upon the course which then promised the greater money return and elected to forego (at least for a time) the protection of the defendant's surety bond in the hope, eventually realized, of getting more money out of the plan of turning over its deposit to another bank for four years without interest. That entrance into this plan was a change of situation from that which would have existed if the plaintiff had stood on the bond is another

fact shown by the pleadings, for then both plaintiff and defendant could have resorted to the assets of Kondor's bank and there would now be no occasion for the plaintiff to sue the defendant for the items of its present claim. It is in truth now suing for the particular loss which arose directly from the situation into which it had voluntarily entered. That this change, whereby the plaintiff's deposit was tied up for four years without interest and all assets of Kondor's bank were handed over to the other bank, precluded the surety company from resorting to those assets to cover or lessen the loss it might have sustained on its bond had it been called upon to perform is a fact clearly shown by the pleadings. The surety company's undertaking was not a contract of insurance, marine or fire, drawing in its train the law of salvage; it was a contract of assurance. It contained no covenant even implying an obligation to make good a shortage in the bankers plan occurring four years later, but contained a covenant which expressly made it liable to pay for Kondor's default at the time it occurred, and when it had done that the surety company had the right to be subrogated pro tanto to the plaintiff's right to recover from Kondor's bank. Whether the amount which in such case it might have recovered would have been more or less than what the plaintiff now demands in this suit is beside the point. The fact remains the plaintiff by its conduct deprived the defendant of that right. I think the surety company should not be relegated to trial and forced to prove that the extension of time given by the plaintiff within which to pay the debt assured by the bond was a variation from the contract of suretyship when the plaintiff itself has shown it. Nor should the surety company be required to prove that the variation was prejudicial in view of the plaintiff's admission that this suit is brought to recover loss arising from that same variation, amounting to $41,600 for four years' interest on the withheld deposit and for other amounts likewise directly and exclusively incident to the variation, such as interest for moneys which the plaintiff had to borrow because of its withheld deposit, and expenses in the form of railroad fares, cost of meals and per diem fees of the plaintiff's trustees while attending conferences, and fees of attorneys, amounting to $8,470 more.

Whether, on an issue of prejudice, it would appear that the defendant would actually have lost more if resort had first been made to its bond than is now demanded of it, and just how much more, is a matter that

will, from the very nature of the case, always remain in the realm of conjecture. It is difficult to prove the consequences of a thing that never happened.

I am strongly of opinion that, on the facts pleaded and admitted and viewed in the light of settled law, the judgment for the defendant should be affirmed.