BRIEFS FOR APPELLANT, WESTERN SURETY COMPANY: Byron E. Leet, Lisa C. DeJaco, Chelsea K. Painter, Louisville, Kentucky.
BRIEF FOR APPELLEE, CITY OF NICHOLASVILLE: William M. Arvin Sr., Nicholasville, Kentucky, Robert L. Gullette, Jr., Nicholasville, Kentucky.
BRIEF FOR APPELLEES, JESSAMINE-SOUTH ELKHORN WATER DISTRICT, JESSAMINE FISCAL COURT, JESSAMINE COUNTY-CITY OF WILMORE JOINT PLANNING COMMISSION: Brian T. Goettl, Nicholasville, Kentucky, Bruce E. Smith, Nicholasville, Kentucky.
BRIEF FOR APPELLEE, JESSAMINE COUNTY WATER DISTRICT NO. 1: Howard Downing, Nicholasville, Kentucky.
BRIEF FOR APPELLEE, JESSAMINE FISCAL COURT: Brian T. Goettl, Nicholasville, Kentucky.
BEFORE: KRAMER, NICKELL, AND THOMPSON, JUDGES.
OPINION
NICKELL, JUDGE:
*104 Western Surety Company ("Western") appeals from the Jessamine Circuit Court's entry of partial summary judgment in favor of the City of Nicholasville, Kentucky ("City"); the Jessamine-South Elkhorn Water District ("J-SEWD"); the Jessamine County Water District No. 1 ("JCWD"); the Jessamine County Fiscal Court ("JCFC"); and, the Jessamine County-City of Wilmore Joint Planning Commission ("JC-CWJPC") (collectively, "Governmental Entities"). The trial court deemed Western liable based on a valid contract[1] it said existed between Western's principal-Central Rock Mineral Company, LLC ("Central Rock")-and Governmental Entities for which approval of a subdivision plat and plans constituted consideration. The court further found, "[p]ayments to Central Rock were never a part" of that agreement; by signing the bonds and riders as principal, Central Rock "stepped into [the developer's] shoes ... undertaking completion of construction and improvement" of the entire development; and, when "Central Rock defaulted," Western became liable to Governmental Entities for completion of the entire project. Finally, the trial court found suit was timely filed under both a two-year window created in the bonds, and the seven-year window specified in KRS 2 413.220. Citing the plain language of its bonds and riders guaranteeing only Central Rock's "faithful performance" of its contract with the real estate developer, untimely filing of the complaint, and unrefuted proof Central Rock performed as required under the bonds-without complaint or claim of breach by the developer-Western argues suit against it should have been dismissed. Following review of the record, the briefs and the law, we reverse and remand for further proceedings consistent with this Opinion.
The heart of this bond dispute is whether Western, as surety, must pay on three performance bonds[3] it issued guaranteeing Central Rock would "faithfully perform" a contract negotiated with real estate developer James A. Hughes, operating under the name JAH Nicholasville Investment, LLC ("JAH").[4] Central Rock acknowledges halting work, but only after JAH ceased paying Central Rock for work it *105 had already completed, leaving City with an unfinished, deteriorating residential-commercial subdivision. Western argues JAH's failure to pay Central Rock excused further performance under the contract by Central Rock.
Around 2005, Hughes proposed construction of Brannon Crossing, a commercial and residential development in Jessamine County near the Fayette County line. Hughes hired Central Rock as excavating and construction contractor for three specific aspects of the project. A written contract between JAH and Central Rock has not been produced, but Central Rock referenced the contract and memorialized its responsibilities under the contract in a letter sent to Hughes on December 1, 2006. The letter states:
[t]he contract referred to in the Performance and Payment bonds [#58 641 332, #58 641 333 and #58 641 334, Central Rock Mineral Company, LLC, 1256 Manchester Street, Lexington, KY 40505 (Principal), Western Surety Company, 10503 Timberland Circle, Suite 200, Louisville, KY 40223 (Surety) and JAH Nicholasville Investment, LLC, 400 Bellerive Boulevard, Suite 200, Nicholasville, KY 40356 (Obligee) ] covers the following:
Completion of the public improvements (i.e. Water Facilities, including, but not limited to, water mains, gate valves, fire hydrants, water services, as-built drawings, etc.; Sewerage Facilities, including, but not limited to, curbs, gutters, sidewalks, pavement, street & stop signs, as-built drawings, etc.; and Storm Drainage Facilities, including, but not limited to, storm sewers, headwalls, manholes, junction boxes, curb inlets, surface inlets, detention basins, grading, seeding, sodding, paved and sodded ditches, erosion controls, as-built drawings, etc.) for the following three final plats in Brannon Crossing:
Jaclyn Drive at Brannon Crossing.
Brannon Crossing (Noland Property) A Portion of Phase 1, Section 1 and Phase 2
Brannon Crossing (Noland Property) Phase 3, Section 1
The Central Rock Mineral Company, LLC contract provides for the completion of these items prior to the expiration of these Performance and Payment Bonds.
While the letter details public improvements Central Rock agrees to complete, it says nothing about when, how or how much Central Rock is to be paid for its services, nor does it provide a timetable for the job. It is undisputed Central Rock had a contract with JAH.
The entire Brannon Crossing development covered more than the three portions mentioned in the above-quoted letter. Five performance bonds[5] issued by XL Specialty Insurance Company ("XL")[6] in March and April 2005, guaranteed Central Rock's work on contracts entered with JAH on February 25, 2005; April 7, 2005; and April 20, 2005. Those contracts pertained to the *106 Brannon Road Extension, Cynthia Way and Lancer Way; Brannon Crossing On Site Sanitary Sewer; Brannon Crossing Waterlines; Brannon Force Main and Pump Station; and, Brannon Crossing, Hughes Way, Cynthia Way and Tyler Way.
The three performance bonds issued by Western on October 6, 2006, identified Central Rock as principal, Western as surety, and JAH as obligee. Other than the specific portion of the project being bonded, the bond number, and the amount of the bond, these three documents are identical and read in pertinent part:
WHEREAS, Principal has entered into a contract with Obligee, dated the 6th day of October, 2006 for [East Brannon road Ext & 54" Storm Sewer Oil Line Crossing, Lexington, KY].
NOW, THEREFORE, if the Principal shall faithfully perform such contract or shall indemnify and save harmless the Obligee from all cost and damage by reason of Principal's failure so to do , then this obligation shall be null and void; otherwise it shall remain in full force and effect.
ANY PROCEEDING , legal or equitable, under this Bond may be instituted in any court of competent jurisdiction in the location in which the work or part of the work is located and shall be instituted within two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first. If the provisions of this Paragraph are void or prohibited by law, the minimum period of limitation available to sureties as a defense in the jurisdiction of the suit shall be applicable.
NO RIGHT OF ACTION shall accrue on this bond to or for the use of any person or corporation other than the Obligee named herein or the heirs, executors, administrators or successors of the Obligee.
(Emphasis added.) Each Western bond references the same contract reached between Central Rock and JAH.
A dual obligee rider was attached to each performance bond. Each rider identified Central Rock as principal, Western as surety and JAH as obligee. Each rider listed City, J-SEWD and JCWD as additional obligees. The riders read in pertinent part:
1. The City of Nicholasville, Jessamine-South Elkhorn Water District and Jessamine County Water District No. 1 is hereby added to said bond as an additional obligee.
2. The Surety shall not be liable under this bond to the Obligee, or either of them unless the said Obligees, or either of them, shall make payments to the Principal strictly in accordance with the terms of the said contract as to payments , and shall perform all other obligations to be performed under said contract at the time and in manner therein set forth.
3. No suit, action or proceeding by reason of any default whatever shall be brought on this bond after two (2) years from the day on which the final payment under said construction contract falls due.
4. Aggregate liability of Surety hereunder to Obligees is limited to the penal sum above stated and Surety, upon making payment hereunder, shall be subrogated to, and shall be entitled to an assignment of all rights of the payee with respect to the particular obligation discharged *107 by the payment, either against principal or against any other party liable to the payee on the discharged obligation.
(Emphasis added.) The three riders were identical to one another but for the bond amount and bond number. Paragraph 2 of the riders hinges Western's liability as surety on obligee(s) paying Central Rock according to its contract with JAH. While the payment agreed to in the contract is unknown, Central Rock did not agree to work for free. The bonds refute that notion by making payment to Central Rock a condition of Western's liability and Central Rock maintains JAH still owes it $1.2 million for work it completed on Brannon Crossing.
When JAH, identified as obligee, ceased paying Central Rock, the bonds shifted responsibility for paying Central Rock to the additional obligees to maintain Western's liability. Governmental Entities, being those additional obligees, claim they never intended to pay Central Rock for any work and lacked authority to do so. Yet, that is the way the bonds were written-and accepted by JC-CWJPC and ultimately by City which annexed[7] Brannon Crossing. They also admit they never paid Central Rock to keep the bonds in force.
In addition to making Governmental Entities liable for paying Central Rock for its work in the event JAH defaulted-which all agree JAH did-the riders also created a two-year statute of limitations for the filing of suit. That language significantly shortened the seven-year window for filing suit on a surety bond stated in KRS 413.220. When the bonds were issued, however, no objection to this term was voiced by JC-CWJPC, nor was it questioned by City.
The date work stopped is contested. Citing deposition testimony of Cooper Hartley,[8] Western maintains Central Rock ceased work in 2007-the same year its assets were sold to L-M Asphalt Partners, Ltd. d/b/a ATS Construction which changed Central Rock's name to Pine Mountain Mineral Company. According to Hartley, after the name change, no work was done by this entity on Brannon Crossing.
Citing an affidavit from Dean Anness, Administrative Officer of City's Planning and Zoning Office, City argues work was still occurring at the jobsite in early 2011. City offered punch lists dated 2008, 2010 and 2011 showing numerous items as incomplete or noncompliant.
On June 5, 2012, City filed suit against all three bonding companies-BSIC, XL and Western-seeking to compel performance under the bonds and alleging Central Rock and JAH "did agree and bind themselves to construct, at their sole expense, certain items of infrastructure, hereinafter referred to as 'public improvements.' " City also alleged: Central Rock and JAH, "(hereinafter 'developers') were required to post Performance Bonds, payable to [City, JCWD and J-SEWD] and in amounts sufficient to pay for the completion of this construction should they fail to do so[;]" Western's bonds guaranteed Central Rock would complete Brannon Crossing; portions of the development remain unfinished; and, City repeatedly demanded Western either make funds available under the performance bonds or finish the promised work in compliance with City's Planning Commission guidelines.
*108 Central Rock, Pine Mountain, JAH, JCWD and J-SEWD were named as defendants in the complaint along with the sureties. Central Rock's assets had been sold; Pine Mountain was administratively dissolved by the Kentucky Secretary of State effective September 10, 2011; and, JAH had filed for bankruptcy in 2013, leaving the sureties as potential sources to pay City for completion of Brannon Crossing. Both water districts filed cross-claims against Western. JCFC and JC-CWJPC filed intervening complaints against Western.
Western moved for summary judgment in 2014, maintaining Central Rock never breached its obligation to "faithfully perform" its contract with JAH and is still owed $1.2 million by JAH for work it completed pursuant to that contract. Governmental Entities, filing their own motion for summary judgment, claimed: Western is liable because Central Rock did not finish the development; KRS 100.281(4) creates a valid contract between Central Rock and Governmental Entities; and, a two-year window for filing suit and language requiring additional obligees to pay Central Rock according to its contract with JAH to keep Western liable on the bonds, must be ignored as mere surplusage under the "statutory bond doctrine."
In granting partial[9] summary judgment to Governmental Entities against Western, the trial court specifically found by identifying Central Rock as "principal" in the bonds, Central Rock "stepped into Hughes's shoes" as developer and made Central Rock's surety liable for completion of the entire Brannon Crossing development because Central Rock did not deliver a completed subdivision. This appeal followed.
Summary judgment is a device utilized by the courts to expedite litigation. Ross v. Powell , 206 S.W.3d 327, 330 (Ky. 2006). It is deemed to be a "delicate matter" because it "takes the case away from the trier of fact before the evidence is actually heard." Steelvest, Inc. v. Scansteel Service Center, Inc. , 807 S.W.2d 476, 482 (Ky. 1991). In Kentucky, the movant must prove no genuine issue of material fact exists, and he "should not succeed unless his right to judgment is shown with such clarity that there is no room left for controversy." Id. The trial court must view the evidence in favor of the non-moving party. City of Florence v. Chipman , 38 S.W.3d 387, 390 (Ky. 2001). The non-moving party must present "at least some affirmative evidence showing the existence of a genuine issue of material fact[.]" Id. On appeal, our standard of review is "whether the trial court correctly found that there were no genuine issues as to any material fact and that the moving party was entitled to judgment as a matter of law." Scifres v. Kraft , 916 S.W.2d 779, 781 (Ky. App. 1996). Furthermore, because summary judgments do not involve fact-finding, our review is de novo. Pinkston v. Audubon Area Community Services, Inc. , 210 S.W.3d 188, 189 (Ky. App. 2006).
Keaton v. G.C. Williams Funeral Home, Inc. , 436 S.W.3d 538, 542 (Ky. App. 2013). With the foregoing principles in mind, we consider whether granting partial summary judgment against Western was appropriate. We conclude it was not.
This appeal presents a question of basic contract interpretation. To be valid, a contract requires "offer and acceptance, *109 full and complete terms, and consideration." Energy Home, Division of Southern Energy Homes, Inc. v. Peay , 406 S.W.3d 828, 834 (Ky. 2013) (internal citations omitted). When a bond is plain, clear and unambiguous, there is no need to go outside the four corners of the bond to interpret its meaning. Cantrell Supply, Inc. v. Liberty Mut. Ins. Co. , 94 S.W.3d 381, 385 (Ky. App. 2002). We apply these standards to any purported contract.
Performance bonds are contracts designed to guarantee the entity posting the bond fulfills its promise. In the context of subdivision development, in exchange for a premium, the surety agrees to indemnify the obligee-usually the entity destined to receive the finished property-against losses stemming from the developer's dishonesty, infidelity or lack of integrity. The surety agrees to make the obligee whole-up to the amount of the bond-for losses resulting from misconduct covered by the bond.
Many jurisdictions regulate subdivision development.[10] City does so through regulations adopted in 1980.[11] Those regulations are consistent with KRS 100.281(4) which requires "provision of good and sufficient surety to insure proper completion of physical improvements[.]" Surety is required to guarantee a developer does not start and stop construction, leaving an unfinished, deteriorating and dangerous site-precisely what happened in this case. In other words, the required surety is intended to protect the local government.
In proposing Brannon Crossing, JAH had a choice. Complete the entire project before submitting the final plat for approval, or post "bond to ensure completion of the improvements ... as provided in Section 343.2[,]" and submit the final plat to the Planning Commission for consideration. Nicholasville Subdivision Regulations ("NSR") Section 343.1, Completion of Improvements. Rather than building first, JAH chose to post bonds to guarantee completion.
Once the bonds were issued-first by XL and later by Western-the plat and plans[12] for the development could receive government approval. Not just any bond would suffice. NSR Section 343.2, Surety, contains critical parameters for posting a surety bond for a subdivision development.
First, "surety to the City shall be executed by the Developer as principal[.]" Id. Western's bonds identified Central Rock, a contractor on the project, as principal. To be compliant, JAH, the true developer, should have been listed as principal. JAH was cast as obligee. At the root of this case *110 is JAH-not Central Rock-failed to perform as it promised when proposing the development. There is no indication Central Rock, by its own volition, simply stopped working.
Second, surety "shall guarantee the faithful performance of any and all work and the construction and installation of all improvements required to be done by the Developer, together with all engineering and inspection costs and fees incurred by the City." Id. Western's bonds did not guarantee faithful performance of any obligation[13] for which developer, JAH, was responsible. Nor did it make the developer responsible for engineering and inspection costs and fees.
Third, "surety to the City shall establish a completion date[.]" Id. Western's performance bonds contain no such date. The only calendar reference in the performance bonds pertains to suit being filed within
two years after Contractor Default or within two years after the Contractor ceased working or within two years after the Surety refuses or fails to perform its obligations under this Bond, whichever occurs first.
The term "Contractor Default" is undefined. In an internal inconsistency, the dual obligee rider-which is a separate page but part of the assigned bond number says:
[n]o suit, action or proceeding by reason of any default whatever shall be brought on this bond after two (2) years from the day on which the final payment under said construction contract falls due.
The bonds do not state when final payment was due.
Fourth, when
developer chooses to use surety, the City shall be authorized, in the event of any default on the part of the developer or the performance of any work or construction of any improvements for which surety has been deposited, to cause the required work to be done and to withdraw that amount required for payment of all cost therefor.
Id. (emphasis added). Because the bonds did not specify "any default" could trigger a demand for payment by surety, the parties were left in the lurch when JAH incurred financial woes and abandoned the project.
City's subdivision regulations contain four very specific mandates. Western's bonds satisfied none of them, but no one enforced the regulations to protect City and other Governmental Entities. Not just any surety, but "good and sufficient surety," was required.
Because the bonds did not adhere to City's regulations, the bonds could not satisfy the posting of "good and sufficient surety" as permitted by KRS 100.281(4). Furthermore, the statute could not create the valid contract Governmental Entities claim it had with Central Rock. City's failure to police the bonds it required created a cascade of errors an award of partial summary judgment cannot fix. Ultimately, City must bear responsibility for failing to *111 ensure Western's bonds were correct and adequate for their intended purpose.
We realize the trial court attempted to balance several competing principles in awarding partial summary judgment against Western. Drafting errors are usually held against the drafter to "effectuate the policy of indemnity." Bituminous Cas. Corp. v. Kenway Contracting, Inc. , 240 S.W.3d 633, 638 (Ky. 2007). In this case, Western-using a CNA Surety[14] template-was the drafter and as such should ordinarily be held accountable for failing to follow City's regulations. Western is, after all, in the business of writing bonds guaranteeing performance of its principals in return for payment of a premium. One could assume a commercial bonding entity would familiarize itself with the laws of the state and community in which it is writing bonds and act accordingly. One could also assume a local government knows its own regulations, adopts them for a reasonable purpose, and enforces them. Assumptions are dangerous. In this instance, the two assumptions, both of which should have been fulfilled-but were not-do not mean Western must pay.
Just as Western could not rewrite the contract reached between Central Rock and JAH via its drafting errors, the trial court could not rewrite the contract between Central Rock and JAH by referencing other documents (a letter, construction drawings, plans, plats and specifications) and eliminating terms negotiated by the parties under the guise of the "statutory bond doctrine."
"Responsibility of a surety rests upon the * * * terms of his contract, but when it is changed without his knowledge or authority, it becomes a new contract and is invalid, because it is deficient in the essential element of consent." While it is a generally accepted rule that the alteration of a contract or its terms without the consent of the surety will operate to discharge him from liability, a mere clerical, immaterial, and nonprejudicial alteration of, or variation from, the contract by the beneficiary will not operate to discharge the surety. Fidelity & Casualty Co. v. Metal Window Products Co. (C. C. A.) 30 F.(2d) 56 ; Greek Catholic Union v. American Surety Co. of New York (C. C. A.) 25 F.(2d) 31 ; London & Lancashire Ind. Co. v. Board of Commissioners , 107 Ohio St. 51, 140 N.E. 672 ; Pickens County v. National Surety Co. (C. C. A.) 13 F.(2d) 758 ; Russell v. Ross , 157 Cal. 174, 106 P. 583.
American Sur. Co. of New York v. Noe , 245 Ky. 42, 53 S.W.2d 178, 182 (1932) (quoting Smith v. United States , 69 U.S. 219, 234, 2 Wall. 219, 17 L.Ed. 788 (1864) ). Once the trial court rewrote the bonds, they were unrecognizable. The trial court's interpretation of Western's bonds was not "a mere clerical, immaterial, and nonprejudicial alteration[,]" it was a wholesale rewrite designed to create the bonds Governmental Entities needed to recover in the wake of a developer abandoning an unfinished subdivision.
Western's bonds reference a single contract between Central Rock and JAH. The trial court gutted those bonds-eliminating all payment for Central Rock-even by JAH-and more than doubling the window in which City could file suit. If those two terms were objectionable to City, they should have been rejected from the start. Requiring a proper surety bond provides substantial protection. Acceptance of a proposed surety bond should be studied, not automatic. By accepting bonds with a shortened statute of limitations and possible *112 payment by additional obligees, City lulled all involved into believing those terms were acceptable.
While trying to save Governmental Entities from their own negligence, the trial court freed JAH of all responsibility under its contract with Central Rock. The trial court then found an entirely new contract between Central Rock and Governmental Entities, proclaiming it to be based on consideration and valid. One major flaw in the trial court's reasoning is Central Rock never agreed to a contract with Governmental Entities. Discerning no offer and acceptance, full and complete terms, and consideration, as required by Energy Home , capped off by a complete failure to follow City's own regulations, there could be no valid contract between Central Rock and Governmental Entities.
At the invitation of Governmental Entities, the trial court applied a theory it called the "statutory bond doctrine"-a name unseen in Kentucky law. Ronald J. Rychlak, in The Truth About FIBs (Financial Institution Bonds) in Mississippi: When Express Terms Conflict with Statutory Requirements, 36 Miss. C.L. Rev. 101 (2017), refers to this theory of law as the "read-in/read-out" rule.
As a general rule, the liability of a surety on a bond which is plain and unambiguous is governed, like any other contract, by the intention of the parties as expressed in the instrument. However, in determining the legal effect of a statutory bond such as is here before the Court, certain rules of construction are to be considered. A statutory bond will be reviewed in the light of the statute creating the duty to give security. It will be generally held that the provisions of the statute and regulations will be read into the bond. Maryland Casualty Co. v. United States , 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297 (1919) ; Whattoff v. United States , C.A. 8, 1966, 355 F.2d 473 ; Jones v. United States , C.A.8, 1951, 189 F.2d 601. So also, if a statutory bond contains provisions which do not comply with the requirements of law, they may be eliminated as surplusage and denied legal effect. Fort Smith Structural Steel Co. v. Western Surety Co. , W.D.Ark., 1965, 247 F.Supp. 674 ; 12 Am.Jur.2d, Bonds § 26.
American Cas. Co. of Reading, Pa. v. Irvin , 426 F.2d 647, 650 (5th Cir. 1970). Kentucky has applied this approach, but only to public official bonds and not in recent years. Bankers' Surety Co. v. City of Newport , 162 Ky. 473, 172 S.W. 940, 941 (1915) (surety on elected treasurer's bond required to pay even though city failed to timely report embezzlement because purpose of required bond was to protect government, not surety). We decline to extend this doctrine to performance bonds under the facts before us. Here, the state and City had legislation in place to protect the government, but it was ignored. Because no one paid Central Rock in conformity with its contract with JAH and Western made payment a condition of the bonds, Western cannot be liable to Governmental Entities under the bonds absent Central Rock having been paid.
The only way Western could be liable on these bonds is if Central Rock failed to perform its contract with JAH due to Central Rock's own failure. There is no evidence that occurred. The evidence is the exact opposite-that Central Rock faithfully performed its contract with JAH, sending monthly invoices to JAH for completed work. At some point, JAH stopped paying those invoices. When the amount owed reached $1.2 million in 2007, Central Rock realized JAH was in financial straits during an economic downturn and was not going to resume making payments. At that point, Central Rock stopped working on *113 the subdivision-not of its own choice-but because JAH stopped paying. Had JAH continued paying, there is no suggestion Central Rock would not have continued working until completion of its agreed-upon tasks.
When JAH stopped paying, it excused any further obligation Central Rock had under its contract with JAH. "A total inability in one party to comply with his part of a contract, should absolve the other party from a compliance." Abney v. Brownlee , 8 Ky. (1A.K. Marsh.) 240, 240 (1818). Additionally, because JAH had no recourse against Central Rock, Governmental Entities-as only third-party beneficiaries-had no greater defenses than JAH. Ping v. Beverly Enterprises, Inc. , 376 S.W.3d 581, 596 (Ky. 2012). Because Central Rock ceased receiving payment from any obligee-not from JAH and not from Governmental Entities-as required by the riders, Western's liability disappeared.
The trial court erred in finding Governmental Entities were entitled to judgment as a matter of law. Scifres , 916 S.W.2d at 781. As a result, the order of the Jessamine Circuit Court awarding partial summary judgment against Western, is reversed and remanded for further proceedings consistent with this Opinion.
KRAMER, JUDGE, CONCURS.
THOMPSON, JUDGE, CONCURS IN RESULT ONLY.

In response to discovery, City originally maintained it had no contract with Central Rock,
except the obligations created by the Preliminary Plat, Final Plat, Construction Plans and Development Plan, above referred to, and the Performance Bonds which guarantee that the construction called for therein would be completed according to the existing City of Nicholasville regulations.
As litigation progressed, City refined its position to argue the plans and specifications for the development constituted a written agreement between itself and Central Rock for completion of the project.

Issued the same day were three dual obligee riders and three payment bonds. The payment bonds, guaranteeing Central Rock would pay its subcontractors, are uncontested.

In May 2008, three years after Brannon Crossing was proposed and nearly two years after Western executed performance bonds on behalf of Central Rock, Bond Safeguard Ins. Co. ("BSIC") executed a bond guaranteeing JAH, as principal, would install and complete public improvements in Brannon Crossing. That bond, listing City as obligee, was to remain in effect until City was satisfied with the work and released the bond. In April 2015, the trial court entered an agreed order dismissing all claims against BSIC with prejudice.

These bonds were originally issued for the benefit of JC-CWJPC. When the covered property was annexed by City, these bonds were assigned to the benefit of City, JCWD and J-SEWD.

Partial summary judgment, nearly identical to the one Western challenges herein, was granted to Governmental Entities against XL in an opinion entered December 16, 2013. After XL filed its notice of appeal and successfully moved this Court to consolidate its appeal with Western's, XL and Governmental Entities executed a full settlement. On XL's motion, in September 2016, this Court dismissed XL's appeal leaving Western as the sole appellant.

Western's brief states annexation occurred before it issued the bonds, but the date of annexation is unclear from the record.

Former president and treasurer of Central Rock.

The trial court reserved for future determination the amount of damages to be paid by Western.

As explained in Nash v. Campbell County Fiscal Court , 345 S.W.3d 811, 814 (Ky. 2011),
[a]ny authorized political subdivision that wants to adopt zoning regulations (land use) and subdivision regulations (divisions of land) must comply with Chapter 100 of the Kentucky Revised Statutes (Planning and Zoning). "When the state has preempted a field, the city must follow that scheme or refrain from planning." Under KRS 100.273(1), the planning commission has initial authority to adopt subdivision regulations. Those counties that do not have planning commissions can adopt subdivision regulations through the fiscal court. KRS 67.083(3)(k) does authorize fiscal courts to adopt planning, zoning, and subdivision regulations "according to the provisions of KRS Chapter 100[.]"
(Internal footnotes omitted.)

In its order granting partial summary judgment, the trial court incorporated the regulations into the record.

The plat and plans submitted for approval of Brannon Crossing bear the name "JAH" alone with no mention of Central Rock. There is also a reference to "Bellerive Development Company, 400 Bellerive Boulavard [sic], Suite 200, Nicholasville"-another JAH entity.

The record does not indicate Central Rock agreed to perform every task necessary to complete Brannon Crossing and bring it into full code compliance. For example, a punch list accompanying a letter from Horne Engineering, Inc. to Greg Bohnett of City's Planning Commission dated April 1, 2011, states, "[t]he trees have not been planted along the south property line." Central Rock's letter to Hughes did not accept responsibility for planting trees. NSR Section 231.291, Locational Criteria [for Street Trees] (1980-2017), authorizes City to request the planting of trees and gives the developer discretion to choose between two specified options when doing so. Despite being listed as the principal in Western's bonds, Central Rock was not the developer of the subdivision.

Western is an underwriter for, and is owned by, CNA Financial.